1

2

3

4

5

6

7

8             **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   MICAH A. HARRIS,                              Civil No.      09cv0503-IEG (AJB)

12                           Petitioner,           **REPORT AND RECOMMENDATION**
                                                    **DENYING PETITION FOR WRIT OF**
13   v.                                             **HABEAS CORPUS**

14   M. MARTEL, Warden,

15                           Respondent.

16

17        Petitioner Micah Harris (hereinafter "Petitioner"), a state prisoner proceeding *pro se*, filed a

18   petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On August 7, 2009, Respondent filed

19   an answer.  This Court has reviewed the petition for writ of habeas corpus, Respondent's answer and

20   all supporting documents.  After a thorough review, this Court **RECOMMENDS** that the petition for

21   writ of habeas corpus be **DENIED** and **DISMISSED**.

22                                          **Background**

23        On August 1, 2006, Petitioner was found guilty of torture (count one), mayhem (count two),

24   assault with intent to commit a specified sex act (count three), attempted rape (count four), and assault

25   by means of force likely to produce great bodily injury (count five).  (Lodgment 2.)  The great bodily

26   injury allegation was found to be true in count five.  (Id.)  Petitioner was found not guilty of attempted

27   rape and the great bodily injury allegations in counts three and four were found not to be true.  (Id.)

28   Petitioner was sentenced an indeterminate life term with the possibility of parole on torture, a four year

1  concurrent middle term on mayhem and a stayed term on the remaining counts.  (Lodgment 3.)  On

2  October 2, 2006, Petitioner filed a notice of appeal.  (Lodgment 4.)  The Court of Appeal affirmed the

3  judgment.  (Lodgment 6.)  On August 27, 2008, the California Supreme Court denied the petition for

4  review without comment or citation.  (Lodgment 7.)

5     On March 13, 2009, Petitioner filed a petition for writ of habeas corpus in this Court.  On August

6  7, 2009, Respondent filed an answer.

7  **Factual Background**

8     The following factual background is taken from the Court of Appeal opinion in <u>People v. Harris</u>,

9  unpublished opinion (Cal. Ct. App., 4th Dist., Div. 1, May 23, 2008).  The Court presumes these factual

10  determinations are correct pursuant to 28 U.S.C. § 2254(e)(1).

11

12  On the night of March 9, 2006, Jacqueline T. drove her car to her friend Michelle's
apartment in Mission Valley.  Jacqueline and several other women – Tammi, Michelle,
13  Phoebe, and Patty – planned to go out together that evening.  Patty drove the group in
her car to a restaurant in Mission Valley.  Jacqueline left her car parked across the
14  street from Michelle's apartment building.  From the restaurant, the group took a
taxicab to the Sidebar nightclub in downtown San Diego.

15

16  That same evening, Harris was at the Sidebar nightclub, sitting at a VIP table with
Kassim Osgood and Osgood's cousin, Wade White.  At approximately 11:15 p.m.,
Jacqueline, along with her friends, joined Harris, Osgood, and White at their table.
17  Jacqueline socialized and danced with Harris and on at least two occasions he kissed
her.

18

19  At approximately 1:45 a.m., shortly after the bar closed, Osgood offered a ride to the
remaining women in Jacqueline's group.  Jacqueline believed that Osgood would drive
them back to Michelle's apartment in Mission Valley.  As Jacqueline was standing next
20  to Osgood's car, Harris told her to come with him instead, since they would all be
going to the same place.  Harris took Jacqueline by the wrist and led her to his truck.

21

22  Once in the truck, Harris pulled down Jacqueline's shirt and kissed her chest.
Jacqueline was surprised by Harris's action and told him to, "Back off," and told him
23  to drive toward Mission Valley.  Along the way, Harris told Jacqueline he was an
Olympic hurdler.  He gave her a card that bore his photograph and contained
24  promotional information about him.

25  Once Harris and Jacqueline arrived in Mission Valley, Harris parked his truck across
the street from Jacqueline's car.  Jacqueline was talking to Tammi on her cell phone
26  as she was getting out of Harris's truck.  Jacqueline learned that Tammi and
Jacqueline's other friends had gone with Osgood to a party in Chula Vista and that
27  Tammi was feeling uncomfortable.  As Jacqueline was opening the door to her car,
Harris took her keys away from her and started to walk back to his truck.  Harris told
28  Jacqueline to stay with him and said he would take her wherever she wanted to go.

1    Jacqueline followed Harris, took her keys back from him, and walked back to her car.

2

3    At about 3:00 a.m., Jacqueline got into the driver's seat of her car, put the key in the
     ignition, and spoke again with Tammi on her cell phone.  As Jacqueline was talking
     with Tammi, Harris stood outside her open car door. He appeared irritated.  Within
4    Harris's earshot, Jacqueline told Tammi that Harris would not leave her alone and she
     did not know what to do. Without warning, Harris punched Jacqueline on the left side
5    of her face.  She screamed for help.  Tammi briefly heard Jacqueline screaming over
     her cell phone before the phone went dead.  Harris continued to punch Jacqueline in
6    the face.  Jacqueline estimated Harris punched her face between five and 10 more times
     while she was sitting in the front seat of her car.  After Harris stopped punching
7    Jacqueline, he grabbed her cell phone.

8    Harris angrily told Jacqueline to "get in the back seat of the fucking car."  Jacqueline
     complied.  Harris yelled at Jacqueline, "You got blood on my fucking jacket, you
9    bitch."  Harris then got in the back seat and punched Jacqueline in the face a couple
     more times.  Harris attempted to pin Jacqueline down and tried to put his hand down
10   her pants.  He forced a fingertip down the front of her jeans.  Jacqueline feared Harris
     was going to rape her.  She told him to stop and continued to struggle with him.

11
     Jacqueline was able to get out of the car and run toward Michelle's apartment complex
12   when Harris became momentarily distracted by a dinging sound caused by the key
     remaining in the car's ignition switch.  As Jacqueline was running, she was screaming,
13   "Help me."  Harris followed Jacqueline as she ran to the patio of an apartment and start
     to climb over the railing.  Harris caught up with her and holding her by the back of the
14   neck, slammed her head against a metal railing, knocking out a tooth and breaking a
     bone in her jaw.

15
     Melvin Toledo, who lived in the complex, was awakened by Jacqueline's screams.  He
16   went to his window and saw Harris with his arm wrapped around Jacqueline's neck,
     and his hand over her mouth.  Toledo saw the two struggle.  He yelled at Harris to
17   leave Jacqueline alone.

18   Betty McLeod, another resident of the apartment complex, was also awakened by
     Jacqueline's screams. McLeod went outside her apartment and saw Harris bent over,
19   with his arms hanging down.  McLeod could not see Jacqueline, but could hear her
     screaming. McLeod shouted, "Where's the women?" Harris yelled back, "Right here."
20   Harris then said, "Can you help her?"  McLeod thought this was "an odd, scary,
     remark," under the circumstances.  Harris appeared "very calm."  McLeod yelled out
21   that she was going to call the police.  Harris responded something to the effect of,
     "Yes, please call the police."  McLeod ran into her apartment and called 911.

22
     Toledo continued to watch the struggle.  He saw Jacqueline open a sliding door and
23   enter an apartment.  She slammed the door shut and locked it.  Toledo watched Harris
     nonchalantly walk away.  Toledo could hear Jacqueline screaming from inside the
24   apartment.

25   At approximately 3:30 a.m., San Diego Police Office Bryon Barmer responded to the
     apartment into which Jacqueline had fled.  Officer Barmer found Jacqueline in the
26   apartment, hysterical and covered in blood.  Her face was very swollen, and her left eye
     was swollen almost shut.  Her upper lip was split and bleeding profusely.  When asked
27   to compare Jacqueline's injuries to those he had seen after other beatings, Officer
     Barmer testified this was the second worst beating he had seen in his 20 years in law
28   enforcement.

1
2
3

Paramedic Mary Cavanaugh arrived at the scene at 3:44 a.m. Jacqueline was bleeding from the mouth, and her face had obvious deformities consistent with facial bone fractures. Cavanaugh was concerned Jacqueline might suffocate because of the restriction of her airway caused by swelling. Cavanaugh designated Jacqueline a major trauma patient and transported her to the hospital.

4
5
6
7
8

Dr. Joseph Bellezzo testified regarding Jacqueline's injuries and the treatment she received at the hospital. Dr. Bellezzo noted Jacqueline suffered a six centimeter laceration to her lip and the inside of her mouth, two nasal fractions, a cheek bone fracture, a hematoma to her ear, blunt trauma to her eyeball, dental trauma, bruising to her neck, and bruising and swelling throughout her face. Dr. Bellezzo opined Jacqueline's injuries were caused by a blunt force and that she had likely suffered at least three separate blows. Dr. Bellezzo explained the blunt force trauma to Jacqueline's mouth must have been particularly severe to have caused bone loss to her jaw above a missing tooth.

9
10
11
12
13
14

Jacqueline testified regarding the pain she had suffered, her injuries, and her medical treatment. She described the pain from Harris's initial blow as "the worst pain I've ever felt in my life." Jacqueline described the numerous procedures she had undergone to replace the tooth she lost, and noted that she had to have a cheek implant to repair the damage from her fractured cheek bone. Jacqueline also explained she had suffered six other chipped teeth, a severe laceration on her lip, severe swelling to her eyes, fractured bones in her nose, soreness in her throat, and bruising at various other locations on her head. Jacqueline explained that after the attack, she initially had no feeling in her lip, and said the doctors had feared she might have suffered nerve damage. Although her condition in this regard had improved, it was still too early to know to what extent she would recover.

15
16

The People presented photographs of Jacqueline's injuries taken shortly after the beating, and at various times thereafter as her injuries started to heal.

17

*Uncharged Offenses*
*Jacqueline P.*

18
19
20
21

Jacqueline P. met Harris at a track and field convention in late November or early December 2005. She talked to him throughout the convention. After the awards dinner, Harris asked if she had any plans for the evening. When she said she was trying to call her friend Stacy D. to see if she was interested in going out for a drink, Harris told her he was going to meet some friends at a nearby bar and suggested her friend could meet her there. Jacqueline P. agreed. They talked for several hours in the bar. Neither Stacy nor any of Harris's friends arrived at the bar.

22
23
24
25
26

After two or three hours, Jacqueline P. said it was late and she needed to go back to the hotel. On the way back to the hotel, Harris put his arm around her and several times suggested she come up to his hotel room, at least for a few minutes to see some photos he had of athletes they had talked about earlier in the evening. She went to his room and sat on the bed while he sat next to her showing her photos on his digital camera. He then grabbed her hand and started massaging it. She pulled her hand away. He knelt on the bed behind her, starting massaging her shoulders and then pressed his whole body against her back. She felt his penis against her back. She stood up, said it was late and that she "better go." She grabbed her purse and left.

27
28

The next day, during a break in the convention, she told Harris she had not enjoyed what had happened the previous evening and it made her feel uncomfortable. That night she went with a female friend to the same bar she had gone with Harris. Harris

was also there with a friend.  They talked.  At one point, Harris said he had found Jacqueline P.'s wallet on the floor and handed it to her.  She put it in her purse.  She left the bar at closing time with her friend and another athlete.

Shortly after she returned to the hotel room she shared with another athlete, she changed into pajamas and fell asleep.  She was "pretty drunk."  She was awakened by her roommate talking on the phone with Harris who claimed he had left his wallet in her purse.  He said he was coming up to retrieve the wallet.  Jacqueline P. got up, left the door open and returned to bed.  She heard Harris in the room.  She told him her purse was on the table at the end of the bed and he could look for his wallet.  Instead, he got into bed next to her.  She told him, "I don't think it's a good idea to stay here," and hoped he would get up and leave.  He, however, lifted up her top and started kissing her back. She told him to leave.  He got up and used the bathroom.  She heard a door close, assumed he had left, and fell asleep.

She was later awakened when she was lying on her side and felt Harris thrusting his penis against her vagina.  The sweatpants and underwear she was wearing had been pulled down below her buttocks. She rolled over and asked him what he was doing. Harris answered that she had grabbed him.  She pointed out that she had been asleep and asked him to step outside to talk.   They talked for five to 10 minutes in the hallway.  She was angry with him and ended the conversation by saying she never wanted to speak or have contact with him again.  She told some of her friends what had happened but did not contact the police because the contact was so brief and she did not know if it was illegal.  However, after she learned of Harris's arrest in this case and had talked with her friends, she contacted the police to tell them of her experience with Harris.

*Monique M.*

On her birthday in February 2005, Monique went out with her friend Billie and some other female friends.  Eventually, Billie drove the group to the Sidebar nightclub in downtown San Diego.  During the evening, people were buying drinks for Monique because it was her birthday.  By closing time, she was feeling ill and was experiencing problems with her hearing and vision.  An antidepressant she had recently started taking may have been a contributing factor.  Her memory of the rest of the evening was unclear; she could only remember bits and pieces.

She remembered standing by the exit to the bar, waiting for her friends.  Harris came up to her, offering to help.  She remembered walking to his car, thinking he was going to drive around to the front of the bar where her friend's car was located.  She next remembered being in his car and him groping her chest as they were getting on a freeway.  She asked him what he was doing.  He said she had asked him to take her home. She tried to give her directions, but she was having difficulty seeing.  The next thing she remembered was being on her knees crawling on the street in a housing development and thinking she would walk home.  Harris told her not to go into the street because it was dangerous and complained about the rain "messing up" his jacket. She recalled then being inside a house, sitting on the toilet and seeing Harris, who was wearing only his boxers, walk by with a bundle of sheets.  Then, she remembered being naked with him in a shower and he was shampooing her hair.

Her next memory was lying on her back on a makeshift bed of blankets on the floor wearing a shirt and boxers that did not belong to her.  Harris was fondling her vagina. When she turned toward him, he pulled his hand away.  She told him she did not know who he was, felt uncomfortable, and asked to use his phone. She called her friend Billie who was "freaking out," and asked where Monique was and where she had been.

1   Harris drove her to Billie's car.  As they were driving, Monique asked Harris who he
    was and what had happened.  He told her his first name, said he had taken care of her
2   and that she had thrown up five to six times, including once in his face.  In response to
    her questions, he told her they did have sex and that he had not used any protection.
3
    When she returned to her family, she learned her grandfather had filed a missing
4   persons report on her.  At his urging, she called the police to inform them she was
    okay; she did not tell them what had happened.  After seeing a news report about Harris
5   in this case, Monique spoke to the police and told them about her experience with him.

6                                      *Defense*

7   Harris admitted punching Jacqueline in the face and ear.  He denied he had punched
    her in the mouth, and also denied he punched her 10 to 15 times.  He also denied
8   having forced Jacqueline's face onto a railing.  Harris denied ever having attempted to
    put his hand down Jacqueline's pants.  He testified Jacqueline fell while she was trying
9   to flee from the car, and she hit her mouth on a railing while she was trying to get away
    from him.
10
    Harris presented evidence that Jacqueline was intoxicated on the night of the charged
11  offense.

12  Harris denied that he had committed the uncharged offenses.  He claimed that the
    sexual contact he had with Monique was consensual, and denied he attempted to have
13  sexual intercourse with Jacqueline P. while she was asleep.

14  Various witnesses testified to Harris's nonviolent and truthful character.

15
    (Lodgment 6 at 2-11.)
16
                                     **Discussion**
17
         Petitioner raises three claims in his petition.  First, he claims the introduction of evidence of prior
18
    uncharged sexual offenses under California Evidence Code sections 1108 ("section 1108") and 1101
19
    ("section 1101")  violated his constitutional right to due process and equal protection and that the trial
20
    court abused its discretion under California Evidence Code section 352 ("section 352").  Second, he
21
    claims the evidence was insufficient to support a conviction beyond a reasonable doubt for torture under
22
    California Penal Code section 206.  Lastly, he argues that the trial court improperly restricted his ability
23
    to cross-examine an adverse witness depriving him of his Sixth Amendment right to confrontation.
24
    **A.    Scope of Review**
25
         28 U.S.C. § 2254(a) provides:
26
         The Supreme Court, a Justice thereof, a circuit judge, or a district court shall
27       entertain an application for a writ of habeas corpus in behalf of a person in custody
         pursuant to the judgment of a State court only on the ground that he is in custody
28       in violation of the Constitution or laws or treaties of the United States.

1

2  28 U.S.C. § 2254(a).  As amended, the AEDPA now reads:

3       (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant
        to the judgment of a State court shall not be granted with respect to any claim that was
4       adjudicated on the merits in State court proceedings unless the adjudication of the claim-
        -
5       (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application</u>
        of, clearly established Federal law, as determined by the Supreme Court of the United
6       States; or
        (2) resulted in a decision that was based on an unreasonable determination of the facts
7       in light of the evidence presented in State court proceeding.

8  28 U.S.C. § 2254(d) (emphasis added).

9       To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2).  <u>See</u>

10  <u>Williams v. Taylor</u>, 529 U.S. 362, 403 (2000).  The threshold question is whether the rule of law was

11  clearly established at the time petitioner's state court conviction became final.  <u>Id.</u> at 406.  Clearly

12  established federal law, as determined by the Supreme Court of the United States "refers to the holdings,

13  as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision."  <u>Id.</u>

14  at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003).  However, Ninth Circuit case law may be

15  "persuasive authority for purposes of determining whether a particular state court decision is an

16  'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly

17  established.'"  <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 2000).  Only after the clearly

18  established Federal law is identified can the court determine whether the state court's application of that

19  law "resulted in a decision that was contrary to, or involved an unreasonable application of" that clearly

20  established Federal law.  <u>See</u> <u>Lockyer</u>, 538 U.S. at 71-72.

21       A state court decision is "contrary to our clearly established precedent if the state court applies

22  a rule that contradicts the governing law set forth in our cases" or "if the state court confronts a set of

23  facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a

24  result different from our precedent."  <u>Williams</u>, 529 U.S. at 405-406.  "A state-court decision involves

25  an unreasonable application of this Court's precedent if the state court identifies the correct governing

26  legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's

27  case" or "if the state court either unreasonably extends a legal principle from our precedent to a new

28

1   context where it should not apply or unreasonably refuses to extend that principle to a new context

2   where it should apply." Id. at 407.  Under Williams, an application of federal law is unreasonable only

3   if it is "objectively unreasonable." Id. at 409.  Further, a state court's decision results in a "decision that

4   was based on an unreasonable determination of the facts in light of the evidence presented in State court

5   proceeding" if it "is so clearly incorrect that it would not be debatable among reasonable jurists."

6   Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997) (citations omitted).

7        In making such a determination under AEDPA, the court looks to the state's last reasoned

8   decision.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where there is no reasoned decision from

9   the state's highest court, the Court "looks through" to the underlying appellate court decision.  Ylst v.

10   Nunnemaker, 501 U.S. 797, 801-06 (1991).  A state court need not cite Supreme Court precedent when

11   resolving a habeas corpus claim.  Early v. Packer, 537 U.S. 3, 8 (2002).  "[S]o long as neither the

12   reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state

13   court decision will not be "contrary to" clearly established federal law.

14   **B.        Admission of Prior Uncharged Sexual Offenses**

15        Petitioner argues that the introduction of evidence of prior uncharged sexual offenses violated

16   his due process rights.  He also contends that the evidence offered under section 1108 violates the Equal

17   Protection Clause of the Fourteenth Amendment.  Lastly, he asserts that the admission of the evidence

18   under section 1108 is an abuse of the trial court's discretion under California Evidence Code section 352

19   ("section 352") because the probative value of the evidence was greatly outweighed by the fact that the

20   evidence was unduly inflammatory, confusing, remote, and time consuming.

21        In the instant case, the California Supreme Court denied Petitioner's petition for review in an

22   order containing no reasoning for its decision. (Lodgment 7.)  Therefore, this Court must look to the

23   last reasoned state court decision and presume that the unexplained opinion rests upon the same ground.

24   See Ylst, 501 U.S. at 803.  The last reasoned state court decision was issued by the Court of Appeal on

25   May 23, 2008.  (Lodgment 6.)

26        The Court of Appeal concluded that the admission of uncharged sexual offense evidence

27   pursuant to section 1108 did not violate his constitutional right to due process or his right to equal

28

1 protection. (Id. at 25.) The Court of Appeal also concluded that the trial court did not abuse its

2 discretion in admitting the evidence of the uncharged sexual offenses. (Id. at 24.)

3 After hearing Jackie P. and Monique M.'s testimony in a pre-trial hearing, the trial court

4 provided a detailed explanation of its reasoning and admitted the evidence of prior uncharged offenses

5 pursuant to section 1108 to show propensity to commit sexual crimes and section 1101(b) to show

6 intent. (Lodgment 14 at 153 - 162.) The court also ruled the evidence was not unduly prejudicial under

7 section 352. (Id.)

8 California Evidence Code section 1108(a) states: "[i]n a criminal action in which the defendant

9 is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or

10 offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to

11 Section 352." Cal. Evid. Code § 1108(a). California Evidence Code section 1101(b) provides that

12 "[n]othing in this section prohibits the admission of evidence that a person committed a crime . . . when

13 relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity,

14 absence of mistake or accident, . . . ) other than his or her disposition to commit such an act." Cal. Evid.

15 Code § 1101(b). California Evidence Code section 352 provides that "[t]he court in its discretion may

16 exclude evidence if its probative value is substantially outweighed by the probability that its admission

17 will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of

18 confusing the issues, or of misleading the jury." Cal. Evid. Code § 352.

19 **1.    Due Process**

20 Petitioner claims that the introduction of evidence of prior uncharged sexual offenses violated

21 his due process rights. Respondent opposes.

22 There is no United States Supreme Court precedent prohibiting the use of uncharged sexual

23 offenses to prove propensity. Estelle v. McGuire, 502 U.S. 62, 75 n. 5 (1991) ("Because we need not

24 reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if

25 it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."); Meija

26 v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008) (rejecting petitioner's claim that the admission of prior

27 sexual offense evidence under section 1108 was unconstitutional); Larson v. Palmateer, 515 F.3d 1057,

28 1065-66 (9th Cir. 2008) (rejecting petitioner's claim that trial court violated due process by admitting

1  evidence of his prior crimes because the Supreme Court expressly reserved the question of whether

2  using evidence of past crimes to show propensity for criminal activity could ever violate due process

3  and so state court did not unreasonably apply clearly established federal law in finding no due process

4  violation); Alberni v. McDaniel, 458 F.3d 860, 866-67 (9th Cir. 2006) (Since Estelle expressly left the

5  issue an open question of whether the introduction of propensity evidence violated due process, the state

6  court did not act in an objectively unreasonable manner.)

7       Since there is no clearly established federal law that the admission of prior uncharged sexual

8  offenses to show propensity violates due process, the Court of Appeal's denial of Petitioner's due

9  process claim was not contrary to, or an unreasonable application of established federal law as

10  determined by the Supreme Court. See 28 U.S.C. § 2254(d)(1); Meija, 534 F.3d at 1046.

11      In addition, the California Supreme Court rejected a due process challenge to section 1108

12  holding that the admission of a defendant's prior sex crimes for the purpose of showing propensity to

13  commit such crimes was constitutional. People v. Falsetta, 21 Cal. 4th 903, 917 (1999).  The Court

14  explained that the court's discretion to exclude propensity under section 352 saves section 1108 from

15  a due process challenge. Id.  The court noted that section 1108 was modeled on Federal Rule of

16  Evidence 413.[1]  Id. at 912.  Federal Rule of Evidence 414 allows similar "propensity" evidence in child

17  molestation cases.  Id.  Further, California Evidence Code section 352 is similar to Federal Rule of

18  Evidence 402 and 403.  Meija, 543 F.3d at 1047 n. 5.  Consequently, the Ninth Circuit has also held that

19  admitting evidence under Federal Rule of Evidence 414 to prove propensity in sex crime cases does not

20  violate due process.  United States v. Le May, 260 F.3d 1018, 1026 (9th Cir. 2001).  Based on the above

21  reasoning, the Court of Appeal's decision upholding the trial court's ruling was not contrary to, or

22  involved an unreasonable application of, clearly established federal law, as determined by the Supreme

23  Court.  See 28 U.S.C. § 2254(d)(1).

24  **2.**    **Equal Protection Clause**

25

26

27

28      [1] Federal Rule of Evidence 413 provides: "[i]n a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant." Fed. R. Evid. 413.

1    Petitioner asserts admitting evidence pursuant to section 1108 violated his federal constitutional

2 right to equal protection.  Respondent disagrees.

3    The Equal Protection Clause ensures people are free from "invidious discrimination" by the

4 government and the law.  Harris v. McRae, 448 U.S. 297, 322 (1980).  Statutes that impinge on a

5 "suspect class" or a "fundamental right" are analyzed under strict scrutiny.  Mass. Bd. of Ret. v. Murgia,

6 427 U.S. 307, 312 (1976).  Otherwise, statutes that differentiate by classifications are analyzed under

7 a "rational basis" standard of scrutiny.  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440

8 (1985).

9    A "suspect class" is a class of persons "subjected to such a history of purposeful unequal

10 treatment, or relegated to such a position of political powerlessness as to command extraordinary

11 protection from the majoritarian political process."  San Antonio Indep. Sch. Dist. v. Rodriguez, 411

12 U.S. 1, 28 (1973).  A "fundamental right" is a right "deeply rooted in this Nation's history and

13 tradition."  Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) (quotation omitted).

14    The Ninth Circuit has determined that sex offenders are not a suspect class.  LeMay, 260 F.3d

15 at 1030-31.  In addition, there is no fundamental right to have a trial free from relevant propensity

16 evidence that is not unduly unfair.  Id.  Since there is neither a suspect class nor a fundamental right that

17 has been infringed upon, the appropriate standard of scrutiny for the statute is "rational basis."

18    Under "rational basis" scrutiny, the admission of propensity evidence pursuant to California

19 Evidence Code section 1108 only has to be "rationally related to a legitimate state interest."  See

20 Cleburne, 473 U.S. at 440.  Classifications are set aside only if they are based solely on reasons totally

21 unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them."

22 Clements v. Fashing, 457 U.S. 957  (1982); see also McDonald v. Bd. of Election Comm'rs, 394 U.S.

23 802, 808-09 (1969).  The California Court of Appeal has held that section 1108 does not violate the

24 equal protection clause because the statute has a rational basis.  People v. Fitch, 55 Cal. App. 4th 172,

25 184-85 (1997) (stating that the California Legislature "determined that the nature of sex offenses, both

26 their seriousness and their secretive commission which results in trials that are primarily credibility

27 contests, justified the admission of relevant evidence of a defendant's commission of other sex offenses.

28 This reasoning provides a rational basis for the law.").  In addition, the state has a legitimate

1  governmental interest in prosecuting crime effectively.  See, e.g., LeMay, 260 F.3d at 1031.  Therefore,

2  the Court of Appeal's decision upholding the admission of this evidence was not contrary to, or involved

3  an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

4  See 28 U.S.C. § 2254(d)(1).

5        **3.      Abuse of Discretion**

6        Petitioner claims that the trial court abused its discretion under state law when it admitted

7  evidence of prior uncharged sexual acts under section 352 because the probative value was greatly

8  outweighed by the evidence being unduly inflammatory, confusing, remote and time consuming.

9        This claim is not cognizable in this federal habeas corpus action because his claim relies

10  solely on state law issues.  Estelle, 502 U.S. at 67.  Accordingly, Petitioner is not entitled to habeas

11  relief.

12        Even if Petitioner alleged a cognizable federal claim, his argument fails.  The California

13  Supreme Court described the factors a court should consider in assessing whether to admit evidence

14  under section 352 that is otherwise admissible under section 1108.  Falsetta, 21 Cal. 4th at 917.

15              Trial judges must consider such factors as its nature, relevance, and possible
                remoteness, the degree of certainty of its commission and the likelihood of
16              confusing, misleading, or distracting the jurors from their main inquiry, its
                similarity to the charged offense, its likely prejudicial impact on the jurors, the
17              burden on the defendant in defending against the uncharged offense, and the
                availability of less prejudicial alternatives to its outright admission, such as
18              admitting some but not all of the defendant's other sex offenses, or excluding
                irrelevant though inflammatory details surrounding the offense.
19

20  Id. at 917.

21        The Court of Appeal agreed with the trial court that the charged offense was similar to the

22  uncharged offenses. (Lodgment 6 at 22.)  The uncharged prior offenses were not remote in time

23  because they occurred within 13 months of the charged offense.  (Id. at 19, 23.)  As to the certainty

24  of the commission of the charged offenses, the Court of Appeal concluded that the witnesses'

25  testimony were not inherently unbelievable.  (Id. at 23.)  Although the admission of the uncharged

26  offenses increased the possibility of undue prejudice, the trial court properly instructed the jury to

27  consider the evidence for the limited purposes of propensity, common plan or scheme, and intent.

28  (Id.)  Further, although a significant amount of time was spent on the uncharged offenses and both of

1  the offenses had inflammatory aspects, the Court of Appeal could not conclude either factor alone or

2  in combination with the other factors, required the evidence be excluded.  (Id.)  Ultimately, the trial

3  court considered the factors in favor of and against the admission of the evidence and the Court of

4  Appeal concluded that the trial court did not abuse its discretion in admitting the evidence of the

5  prior uncharged sexual offenses.  (Id.)  Based on the factors presented in Falsetta, the Court agrees

6  with the Court of Appeal.  Based on the foregoing, the Court concludes that the Court of Appeal's

7  decision was neither contrary to, nor involved an unreasonable application of, clearly established

8  federal law, as determined by the United States Supreme Court.  See 28 U.S.C. 2254(d)(1)  Thus,

9  habeas relief is not warranted on this claim.

10  **C.      Insufficient Evidence To Support his Conviction of Torture**

11          Petitioner maintains that there was insufficient evidence to support his conviction of torture.

12  Respondent argues that there was sufficient evidence to support his torture conviction.

13          The Due Process clause of the Fourteenth Amendment guarantees that a criminal defendant

14  may only be convicted "upon proof beyond a reasonable doubt of every fact necessary to constitute

15  the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  The clearly

16  established law regarding sufficiency of evidence is found in Jackson v. Virginia, 443 U.S. 307, 324

17  (1979).  The relevant inquiry is "whether, after viewing the evidence in the light most favorable to

18  the prosecution, *any* rational trier of fact could have found the essential elements of the crime

19  beyond a reasonable doubt."  Id. at 319 (emphasis in original).  A petitioner is entitled to habeas

20  corpus relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact

21  could have found proof of guilt beyond a reasonable doubt."  Id. at 324.  A petitioner bears a heavy

22  burden when he challenges the sufficiency of the evidence used to obtain a state conviction on

23  federal due process grounds.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

24

25          Under California law, "[e]very person who, with the intent to cause cruel or extreme pain

26  and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts

27  great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture."

28

1  Cal. Penal Code § 206.  Section 12022.7(f) provides that "'great bodily injury' means a significant

2  or substantial physical injury."

3        Conviction of the crime of torture requires two elements: (1) the infliction of great bodily

4  injury, and (2) the specific intent to cause cruel or extreme pain and suffering for the purpose of

5  revenge, extortion, persuasion, or for any sadistic purpose.  People v. Massie, 142 Cal. App. 4th 365,

6  370-71 (2006).  "Torture does not require the defendant act with premeditation and deliberation,

7  and it does not require that he intend to inflict prolonged pain."  Id. at 371 (citation omitted).  The

8  intent to inflict "cruel" pain and suffering is interpreted as intent to inflict extreme or severe pain.

9  People v. Burton, 143 Cal. App. 4th 447, 452 (2006).  "Absent direct evidence of the specific intent,

10  the circumstances of an offense can establish the intent to inflict extreme or severe pain."  Id.

11  (defendant convicted of torture for inflicting four deep cuts that went down to the muscle on

12  victim's face and one to her tongue); see also People v. Hale, 75 Cal. App. 4th 94, 106 (1999)

13  (smashing victim's teeth out with a hammer constitutes torture).  An inference of an intent to cause

14  extreme pain can be made when a defendant focuses his attack on a particularly vulnerable area,

15  such as the face, rather than indiscriminately attacking the victim.  Burton, 143 Cal. App. 4th at 452.

16  "[S]carring and disfigurement constitute strong circumstantial evidence of intent to inflict severe

17  pain and suffering."  People v. Baker, 98 Cal. App. 4th 1217, 1224 (2002).  The severity of the

18  wounds can also be considered.  Burton, 143 Cal. App. 4th at 452.

19        The Court of Appeal concluded that there was sufficient evidence to support a conclusion by

20  a jury that Petitioner committed the crime of torture.  (Lodgment 6 at 17.)

21        At trial, the victim testified that Petitioner punched her in the face without warning as she sat

22  in her car talking on the phone.  (Lodgment 8 at 276.)  He continued to punch her in rapid

23  succession on the left side of her face and body between five and ten times without any provocation.

24  (Id. at 279-80.)  When he demanded she move to the back seat, she complied and he hit her twice

25  more in the face and yelled at her for getting blood on his jacket.  (Id. at 283-84.)  When the victim

26  had an opportunity and fled from the car, Petitioner pursued her.  (Id. at 288-90.)  As she climbed

27  over a railing that enclosed a patio of an apartment, Petitioner grabbed the back of her neck and

28  slammed her face so hard against a metal railing that the force broke her tooth and a bone in her jaw.

1   (Id. at 291.)  According to the victim, she was screaming the loudest she ever screamed in her life

2   and was bleeding profusely.  (Id. at 289, 292.)  She was then able to enter an apartment through a

3   sliding glass door that was open.  (Id. at 292.)   A witness stated that Petitioner appeared very calm

4   and asked the witness to help.  (Lodgment 9 at 465.)  The witness thought this was "an odd, scary,

5   remark" under the circumstances.  (Id.)  The witness yelled out that she was going to call the police

6   and Petitioner responded something to the effect of, "yes, please call the police."  (Id. at 467.)

7          The victim's injuries were severe and numerous.  The police officer who first responded to

8   the scene described the victim's beating as the second worst he had seen in his 20 years as a police

9   office.  (Id. at 494.)  The officer said the victim's face was very swollen, including both her eyes.

10  (Id.)  Her left eye suffered more trauma and was swollen shut.  (Id.)  Her whole upper lip was slit

11  and she was bleeding profusely from the mouth.  (Id.)  He said her entire head was covered in blood.

12  (Id.) Initially, because of the lighting in the apartment, the officer thought the victim was a redhead

13  but later at the hospital, he discovered she was a blond.  (Id. at 488.)  The blood had discolored her

14  hair.  He further stated that her clothing was bloody and the amount of swelling to her head caused

15  him to believe she had been traumatized pretty heavily.  (Id. at 488-489.)

16         At the hospital, she bypassed the emergency room and was treated in the trauma suite.  (Id. at

17  976.)  Dr. Bellazzo testified that the victim had a six centimeter laceration to her lip and the inside of

18  her mouth.  (Id. at 979.)  He opined that her injuries were caused by a blunt force with at least three

19  separate blunt blows.  (Id. at 980.)  She had a maxillary sinus fracture (cheekbone), nasal bone

20  fracture, significant hematoma to her ear and dental trauma, and a laceration to her lip.  (Id. at 980-

21  81.)  He explained that there must have been a significant force that caused her to have a maxillary

22  sinus fracture.  (Id. at 981.)

23         The victim testified that she had to get stitches that went on the inside of her mouth along the

24  gum line to where her teeth ended.  (Lodgment 8 at 298.)  She also had stitches on the outside of her

25  lip that left a visible scar.  (Id.)  The victim had not regained all the feeling in her lips due to the

26  possibility of nerve damage.  (Id.)  Her front tooth had been ripped out so violently that she lost bone

27  in her upper jaw above the tooth.  (Id. at 299.)  She had to undergo multiple surgeries to repair the

28  bone which required putting in a screw.  (Id.)  Six other teeth were chipped and had to be fixed.  (Id.

1   at 300.)  Her left eye was swollen shut for a long time and many blood vessels popped causing her

2   eyes to be red for a long time.  (Id.)  Her right eye was also swollen.  Her left ear was also bruised

3   and very swollen.  (Id.)  She was so swollen that she did not have a neck on the left side.  (Id.)  She

4   also had a fracture in her cheek which required a cheek implant and two fractures in her nose.  (Id. at

5   300-01.)  She has a bald spot back where she lost hair from a bump on the back of her head.  (Id. at

6   301-02.)

7          It is obvious that the victim suffered great bodily injury.  In addition, there was strong

8   circumstantial evidence that Petitioner had the intent to inflict severe pain and suffering.  The victim

9   had severe and traumatic injuries, the attack focused on the face, she had a scar on the outside of her

10  lip and there was a possible risk of permanent nerve damage in her lips.  The victim's whole face

11  was traumatized and had to be reconstructed.  Her mouth received multiple surgeries to repair her

12  teeth, lips and bone in her mouth while her cheekbone, nose, ear, eyes and head had major trauma

13  which required reconstruction or significant care.  Based on the extent and severity of her injuries,

14  there was sufficient evidence for a jury to conclude that Petitioner had the specific intent to cause

15  cruel or extreme pain and suffering.

16         In addition, the jurors could infer that Petitioner attacked the victim for revenge for her

17  insulting remark or some other sadistic purpose.  Petitioner continued to hit the victim even after she

18  was injured and defenseless.  There were breaks between his attacks and he had time to reflect.

19  After the initial attack in the front seat of the victim's car, Petitioner complained that the victim got

20  blood on his jacket.  Later, during the attack at the railing, he was composed enough to interact with

21  the neighbors, who described the Petitioner as very calm.  Any rational trier of fact could have found

22  that Petitioner's continued attacks were not vicious anger to the victim's insulting comments but

23  were deliberate acts done with the specific intent to inflict pain on the victim for the purpose of

24  revenge for her insulting remark or some other sadistic purpose.  See Jackson, 443 U.S. at 324.

25  Given these circumstances, the Court concludes that there was sufficient evidence that Petitioner

26  committed the crime of torture.  Accordingly, the Court concludes that the Court of Appeal's

27  decision was neither contrary to, nor involved an unreasonable application of, clearly established

28  federal law, as determined by the United States Supreme Court.  See 28 U.S.C. 2254(d)(1).

1 **D.      Right to Confront under the Sixth Amendment**

2          Petitioner argues that the trial court violated his right to confront Monique M., an adverse

3 witness, by restricting his cross-examination of her regarding a possible motive she may have had

4 for fabricating the allegations against Petitioner.  Respondent claims that Petitioner's right to

5 confrontation was not violated.

6          The Confrontation Clause states: "[i]n all criminal prosecutions, the accused shall enjoy the

7 right . . . to be confronted with the witnesses against him. . . ."  U.S. Const. amend. VI.  The clause

8 provides a procedural guarantee to assess the reliability of testimonial evidence through cross-

9 examination.  Crawford v. Washington, 541 U.S. 36, 61 (2004).  The right to confront is not absolute

10 and may, in appropriate cases, accommodate other legitimate interests in the criminal trial process.

11 Chambers v. Mississippi, 410 U.S. 284, 295 (1980).  Trial judges "retain wide latitude insofar as the

12 Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on

13 concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'

14 safety, or interrogation that is repetitive or marginally relevant."  Delaware v. Van Arsdall, 475 U.S.

15 673, 679 (1986).  In fact, "a trial judge retains 'wide latitude' to limit defense counsel's questioning

16 of a witness without violating a defendant's Sixth Amendment rights."  Carriger v. Lewis, 971 F.2d

17 329, 333 (9th Cir. 1992).

18          Under California Evidence Code section 352, a trial court has discretion to exclude evidence

19 if its probative value substantially outweighs the probability that its admission will necessitate undue

20 consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of

21 misleading the jury.  Cal. Evid. Code § 352.  In People v. Quartermain, 16 Cal.4th 600, 623-24

22 (1997), the California Supreme Court held that a trial court may restrict cross-examination of an

23 adverse witness under section 352 and "that the court's limitation pertaining to the credibility of a

24 witness does not violate the confrontation clause unless a reasonable jury might have received a

25 significantly different impression of the witness's credibility had the excluded cross-examination

26 been permitted."  Id. at 623-24.

27          In this case, the Court of Appeal concluded that the trial court did not violate Petitioner's

28 federal constitutional right to confrontation.  (Lodgment 6 at 33.)  The court explained that a cross-

1  examination would not have produced probative evidence showing that Monique was in fear of Viltz

2  at the time of the incident with Petitioner. (Id. at 32.) Further, even if the proposed cross-

3  examination of Monique would have produced evidence from which the jury could have inferred

4  that Monique feared Viltz and had a motive to tell him that her encounter with Petitioner was

5  nonconsensual, Monique waited more than a year to report the incident to the police. (Id.)

6  Therefore, the jury would have been unlikely to draw an inference that Monique had a motive for

7  initially fabricating the nonconsensual nature of the incident because the evidence did not explain

8  why she waited a year to report this purportedly fabricated incident to the police. (Id. at 33.)

9       At a section 402 hearing, Monique testified on cross-examination about the circumstances

10  under which she told her ex-boyfriend, William Viltz, about the February 2005 incident with

11  Petitioner. (Lodgment 14 at 126-130.) She stated that in December 2004, she obtained a restraining

12  order against Viltz after he grabbed her by the neck and lifted her off the ground. (Id. at 127.) She

13  learned that while she was believed to be missing, the police had talked with Viltz to determine if he

14  was responsible for her disappearance. (Id. at 129.) Later at trial, Monique testified that Viltz may

15  have been the first person she told about the details of the incident with Petitioner. (Lodgment 11 at

16  901.) She also testified that she and Viltz had broken up in 2004 and she had obtained a restraining

17  order against him. (Id. at 901-02.) After the prosecution objected to several questions about the

18  restraining order, a sidebar conference was held with the judge where defense counsel presented his

19  argument about the relevance of bringing up the circumstances surrounding the restraining order

20  against Viltz. (Id. at 902-04.) The prosecutor argued the evidence was irrelevant because Monique

21  testified that Viltz was concerned about her welfare and there was no evidence Viltz was jealous or

22  that Monique was fearful of him. (Id. at 904.) Moreover, there was no motive to fabricate because

23  Monique did not report the incident with Petitioner to the police until over year later. (Id.) After

24  hearing both sides, the trial judge ruled the evidence was irrelevant and more prejudicial than

25  probative under section 352. (Id. at 905.)

26       The Court concludes that the trial court reasonably ruled that the evidence was irrelevant and

27  more prejudicial because it would "dirty up that witness" than probative because it is "too remote"

28  under section 352. (Lodgment 11 at 905; Lodgment 13 at 1212.) Monique stated that she was not

1  fearful of Viltz when she told him what happened with Petitioner and any cross-examination would

2  not have been fruitful.  In addition, even if there was an inference that Monique had a motive to

3  fabricate, there was no explanation why she waited a year before telling the police what had

4  happened.  Therefore, the Court of Appeal's ruling that the trial court did not violate Petitioner's

5  right to confrontation was neither contrary to, nor involved an unreasonable application of, clearly

6  established federal law, as determined by the United States Supreme Court.  See 28 U.S.C.

7  2254(d)(1).

8                                                                      **Conclusion**

9          Based on the foregoing, the undersigned Magistrate Judge recommends that the petition for

10  writ of habeas corpus be **DENIED** and **DISMISSED**.  This report and recommendation is submitted

11  by the undersigned Magistrate Judge to the United States District Judge assigned to this case,

12  pursuant to the provisions of Title 28, United States Code, section 636(b)(1).

13          **IT IS ORDERED** that no later than **December 8, 2009**, any party to this action may file

14  written objections with the Court and serve a copy on all parties.  The document should be captioned

15  "Objections to Report and Recommendation."

16          **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court

17  and served on all parties no later than **December 22, 2009**.  The parties are advised that failure to

18  file objections within the specified time may waive the right to raise those objections on appeal of

19  the Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20

21  IT IS SO ORDERED.

22

23  DATED:  November 6, 2009

24                                                                      _____
                                                                        Hon. Anthony J. Battaglia
25                                                                      U.S. Magistrate Judge
                                                                        United States District Court
26

27

28